**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-216 (JMC)** |
| **v.** | : | |
| | : | |
| **DAVID WALLS-KAUFMAN,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Walls-Kaufman to 60 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant David Walls-Kaufman, a 66-year old chiropractor—and former Congressional committee staffer—participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Walls-Kaufman pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 60 days' incarceration and 3 years' probation

---

[1] Although the Statement of Offense in this matter, filed on January 19, 2023, (ECF No. 24 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

is appropriate in this case because Walls-Kaufman, a former Congressional staffer: 1) was among the first group of rioters to enter through the Rotunda Doors; 2) entered the conference room of the Speaker of the House of Representatives, 3) joined with a mob that attempted to breach the doors to the Speakers' Lobby, directly outside the House Chamber where members of the House were sheltering and attempting to evacuate to a place of safety; 4) scuffled with police while being removed from the Capitol; 5) remained on the Capitol Grounds for hours, until nearly six o'clock; and 6) minimized his conduct in a post-arrest interview with the FBI.

Walls-Kaufman entered the Capitol among the first rioters who breached the Rotunda doors on the east side of the building. After being sprayed with a chemical irritant, Walls-Kaufman washed out his eyes, entered the Rotunda, and made his way to the offices of the Speaker of the House, where he assisted in opening a door to a conference room, then entered that room, where he remained for several minutes. He later joined a mob that walked through the halls surrounding the House chamber, eventually coming to the door to the Speaker's Lobby—an area behind the House chamber where Congresspeople were evacuating from the chamber to a place of safety. While present with this mob, a rioter attempted to jump through a glass window and was shot by a United States Capitol police officer.

Despite having personally observed this violence, Walls-Kaufman continued his trespass through the Capitol Building, and scuffled with members of a Metropolitan Police Department Civil Disturbance Unit who were quickly removing rioters from the House hallways and out through the House Interior Doors in the wake of the shooting. After leaving the Capitol, Walls-Kaufman remained on the Grounds of the Capitol for nearly three hours. When he spoke to the FBI after being arrested, Walls-Kaufman minimized his conduct, explaining that he had gone into the Capitol to assist an elderly woman and man. The United States does not credit this explanation

and has identified no video to substantiate any allegation that Walls-Kaufman assisted anyone or entered with any purpose to assist anyone.

The Court must also consider that Walls-Kaufman's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Walls-Kaufman's crime support a sentence of 60 days' incarceration and 3 years' probation in this case.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at ¶¶ 1-7.

### Defendant Walls-Kaufman's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, David Walls-Kaufman walked from his home on Capitol Hill, Washington, D.C. to the U.S. Capital. He rushed with the crowd past downed barriers on the East Front of the Capitol and entered through the Rotunda Doors. *See Exhibit 1* (beginning at time stamp 7:00 on right hand side; pushing at the doorway at 13:30; entering at 14:15). After entering, Walls-Kaufman observed other rioters attack police officers after entering (Exhibit 2). Another rioter helped Walls-Kaufman wash out his eyes with a water bottle (Exhibit 3), presumably neutralizing a chemical irritant police officers had used against rioters by police.



*Image 1 from Exhibit 1: Walls Kaufman recording video of the riot with his mobile phone*



*Image 2 from Exhibit 1: Walls-Kaufman rushing toward the Rotunda Doors*



*Image 3 from Exhibit 2: Walls-Kaufman observes other rioters fight with police*



*Image 4 from Exhibit 3: another rioter helps Walls-Kaufman wash out his eyes*

Walls-Kaufman walked through the Rotunda, eventually coming to the Speaker of the

House of Representatives' office suite. Walls-Kaufman arrived at the Speaker's conference

room, with its two adjoining doors (Exhibit 4). Walls-Kaufman walked through one of those

doors and opened the adjoining second door (Exhibit 5 at 2:45). A video, recovered from Walls-

Kaufman's phone, shows the inside of the Speaker's conference room (Exhibit 6). The video

captured the sound of something breaking and another rioter yelling, "Don't destroy shit." Walls-

Kaufman took a photograph, later recovered from his phone, of a laptop on the conference table.



*Image 5 from Exhibit 5: Walls-Kaufman unlatching the second door*



*Exhibit 7: Walls-Kaufman's photograph of a laptop in the Speaker's Conference Room*

Walls-Kaufman continued onward and joined a mob that tried to gain entrance to the main door to the House Chamber (Exhibit 8). Members of the mob chanted and yelled, "Stop the steal!" and "Break it down!" in reference to the House Chamber door. Walls-Kaufman and other members of the mob walked together to the entrance to the Speaker's Lobby, which adjoins the House of Representatives Chamber. Walls-Kaufman was present when a rioter smashed out of pane of glass in a makeshift barricade and another rioter climbed through the broken window towards the area where Members of Congress were sheltering and trying to evacuate. Walls-Kaufman was in the Speaker's Lobby approximately one to two minutes after the rioter was shot. (Exhibit 9) Walls-Kaufman also took a photograph at 2:47 p.m., which was later recovered from his phone (Exhibit 10).



*Image 6 from Exhibit 9: Walls-Kaufman present at the entrance to the Speaker's Lobby*



*Exhibit 10: Walls-Kaufman's photograph of the door to the Speaker's Lobby*

In the wake of the shooting, additional police officers arrived to clear rioters out of the

Speaker's Lobby by pushing them towards the House Interior Doors and out of the building.

While there, Walls-Kaufman was slow to acknowledge and obey police officers' commands to

leave the building (Exhibits 11 & 12). Walls-Kaufman told one of the officers, "Get your fucking

hand off of me." (Exhibit 13).



*Image 7 from Exhibit 11: Walls-Kaufman scuffling with police*

After exiting, Walls-Kaufman remained on the Capitol Grounds until at least 5:37 p.m.

(Exhibit 14), when police ordered him to leave.

Walls-Kaufman also stored digital images he took on January 6 on an iCloud account.



*Exhibit 14: Walls-Kaufman at the Peace Circle*

*Walls-Kaufman's Social Media*

Walls-Kaufman is a defendant in a civil case arising out of the January 6 attack that predated the charging of the criminal case. *Smith et al. v. Kaufman et al.*, 21-cv-2170 (ACR).[2] It is stayed pending the resolution of this criminal action. *Smith et al.,* Minute Order of December 12, 2022 (granting defendant Walls-Kaufman's motion to stay). Important for the purposes of this criminal action is that the civil complaint, filed on August 13, 2021, identified Walls-Kaufman in part through a video on YouTube in which Walls-Kaufman was wearing the same distinctive motorcycle jacket that he wore on January 6. *Smith et al.*, ECF #2 (Amended Complaint), Ex. A at 2. *See also* Exhibit 15 (Body Worn Camera video of MPD Officer Jeffrey

---

2 Erin Smith, the widow of MPD Officer Jeffrey Smith, who was involved in the scuffle with Walls-Kaufman discussed above, has provided a statement she would like the Court to consider at sentencing. *See* Attachment 1. The government notes that under 18 U.S.C. § 3661, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Smith). The FBI had filed a preservation request and subsequently applied for and was granted a search warrant of YouTube to retrieve this video, but despite having filed the preservation request on August 13, 2021, and having observed the video on August 15, 2021, the video was removed from YouTube, before YouTube preserved the data per the preservation request. During his interview with the FBI, Walls-Kaufman said a tai chi student of his took care of his YouTube channel, and he did not know why or how it was deleted. The United States submits that Walls-Kaufman or his agent removed the video. The United States also notes that Walls-Kaufman's twitter account, which has activity virtually every month, has no posts between October 31, 2020, and January 13, 2021, which the Government submits is evidence that he deleted posts related to the 2020 election and the Electoral College certification of January 6, 2021.

*Defendant's Interview*

Walls-Kaufman gave a post-arrest interview to the FBI where he minimized his conduct and provided a dubious explanation for his conduct on January 6, though he admitted to entering the Capitol. For instance, Walls-Kaufman described that a "white-haired man and white-haired woman" were being crushed during the crowd's surge and that Walls-Kaufman wrapped his arm around a woman to protect her and that he brought her inside. This fanciful tale is not borne out by the evidence. *See Exhibits 1-3.* At another point, Walls-Kaufman described that *he* was pushed into the Capitol. This too, is not borne out. *Id.* At yet another point, Walls-Kaufman said he walked in, and that police waved at him. This third explanation for his entrance is also not borne out. *Id.* The government submits that Walls-Kaufman was attempting to minimize and justify his conduct. Walls-Kaufman also described holding a position as a "gopher" at Congress's Joint Economic Committee in 1980 or 1981, and as such he stated he was familiar with the Capitol, and merely

walked around to find a way to get out, a claim belied by his thirty minutes inside the Capitol. Statement of Offense at ¶¶ 9-11.

During the interview, Walls-Kaufman extensively discussed misinformation about the 2020 election being "stolen." He admitted he went into the Capitol, admitted where he went inside the Capitol, and that he walked around to the West front as well. He additionally identified the clothing he wore on that day and acknowledged taking photos.

*The Charges and Plea Agreement*

On June 7, 2022, the United States charged Walls-Kaufman by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 8, 2022, law enforcement officers arrested him in Crofton, Maryland. On June 16, 2022, the United States charged Walls-Kaufman by a 4-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On January 19, 2023, pursuant to a plea agreement, Walls-Kaufman pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Walls-Kaufman now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Walls-Kaufman faces up to six months of imprisonment and a fine of up to $5,000. Walls-Kaufman must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration and 3 years' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Walls-Kaufman's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Walls-Kaufman, the absence of violent or destructive acts is not a mitigating factor. Had Walls-Kaufman engaged in such conduct, he or she would have faced additional criminal charges.

Among the most important factors in Walls-Kaufman's case are:

Walls-Kaufman physically scuffled with police officers who were attempting to quickly move rioters out of the Capitol following the shooting of a rioter outside the Speaker's Lobby. Rather than complying with police commands, he cursed at them, and officers had to forcibly removed him from the Capitol.

Walls-Kaufman was undeterred in entering the Capitol, joining with other rioters, and staying on the Grounds despite having been exposed to a chemical irritant upon entrance, observing another rioter be shot when she attempted to enter an area where members of Congress

were evacuating and being forced out of the Capitol by police. Even after leaving the Capitol, Walls-Kaufman remained on Capitol Grounds for at least almost three hours.

Walls-Kaufman entered into sensitive spaces of the Capitol that would never be open to the public, specifically the Speaker's Conference Room. Although he was not the rioter who initially opened the first of two doors into the Conference Room, he is visible, as described above, unlatching a second door in an already-open doorway, to permit additional rioters to enter the sensitive space. Walls-Kaufman's interest in the laptop in the Speaker's Conference Room was clear because he took a picture of it himself, which was retrieved from an iCloud search warrant of his account, as described above.

Perhaps most striking is Walls-Kaufman's longtime residence in Washington, D.C., mere blocks from the Capitol, and his prior employment by the Joint Economic Committee in 1980 or 1981, per his interview with the FBI. Moreover, as discussed in the Draft Presentence Investigation Report (PSR)[3] at ¶ 30, Walls-Kaufman's stepfather was a longtime Congressional staffer. Walls-Kaufman also self-reported that he had taught tai-chi on Capitol Grounds. PSR at ¶ 44. Accordingly, Walls-Kaufman knew that by storming the Capitol, he was not only endangering Members of Congress, but also the hundreds of police officers, as well as staff of the Architect of the Capitol, personal and professional staff, and committee staffers—like he and his stepfather had once been—who work at the U.S. Capitol. Those persons were not only placed in danger; they were terrified by the riot. "As rioters overtook Capitol Police and stormed the building, some staffers took cover in offices, hiding under desks, donning gas masks and barricading doors." https://rollcall.com/2021/01/28/insurrection-aftermath-staffers-struggle-with-trauma-guilt-and-

---

[3] All citations to the PSR are to the Draft Presentence Investigation Report at ECF #26, as at the time of this filing, a final Presentence Investigation Report was not on the docket.

fear/ (visited April 12, 2023); see also https://apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e29724aa6017180259385642c1b990 ("Trapped in the gallery of the House, occupying balcony seats off-limits to the public because of COVID-19, roughly three dozen House Democrats were the last ones to leave the chamber on Jan. 6, bearing witness as the certification of a presidential election gave way to a violent insurrection. As danger neared, and as the rioters were trying to break down the doors, they called their families. They scrambled for makeshift weapons and mentally prepared themselves to fight. Many thought they might die.") (visited April 12, 2023).

Finally, Walls-Kaufman, upon being arrested, minimized his own conduct, telling a fanciful tale about protecting some other person. However, at that meeting, Walls-Kaufman acknowledged his entrance into the Capitol and identified himself on pictures to the FBI Special Agent.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 60 days' incarceration in this matter.

### B. The History and Characteristics of Walls-Kaufman

As set forth in the PSR, Walls-Kaufman has no criminal history, besides an arrest for simple assault in 1986 that was *nolle prosequi'd*. Walls-Kaufman is employed, reports no medical or mental health issues, and has been compliant with his conditions of release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This

was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Walls-Kaufman persistence in penetrating and remaining at the Capitol, despite numerous obstacles speaks to the need for a sentence of incarceration for specific deterrence. At the entrance to the Capitol, Walls-Kaufman was sprayed with a chemical irritant; still he pressed on. At the entrance to the Speaker's Lobby, another rioter was shot while jumping through a window; still he remained defiant. At the House Interior doors, where police pushed him and other rioters out of the Capitol, Walls-Kaufman cursed at and scuffled with them. After those thirty minutes in the Capital, Walls-Kaufman remained on the Grounds for at nearly three hours, almost to the point of the 6 p.m. curfew issued by the Mayor of the District of Columbia.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Walls-Kaufman based on his own conduct and relevant characteristics, but

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Walls-Kaufman has pleaded guilty to Count 4 of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section

3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed,

and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his

exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Speaker's office suite, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D) (disorderly

conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration. Both Rau and Jancart were inside the Capitol for approximately 40 minutes. Unlike Walls-Kaufman, both had some criminal history.

Like Walls-Kaufman, Andrew Ericson went to the Speaker's Conference Room. He posed for a selfie photograph there, as well as for as a photograph resting his feet on the conference table. Ericson also took a beer from a fridge inside the conference room. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3. Judge McFadden imposed a sentence of 20 days' imprisonment, stating: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." That put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Ericson,* Tr. 12/10/21 at 21.

In *United States v. Spencer*, 21-cr-147-CKK, the defendant also pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like Walls-Kaufman, Spencer went into the suite of offices of the Speaker of the House, went to the main door of the House chambers, witnessed violence against police officers, and minimized her conduct to the FBI. Gov. Sentencing Mem, *Spencer*, ECF # 55 at 1-2. Unlike Walls-Kaufman, Spencer brought her 14 year-old minor child with her. *Id.* Judge Kollar-Kotelly imposed a sentence of 90 days incarceration.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) in connection with invading the Spouse's Lounge of the Capitol. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing. Gov.

Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Judge Chutkan sentenced Mazzocco to 45 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[5]

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 60 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Jeffrey A. Kiok_____
       JEFFREY A. KIOK
       Attorney (detailed)
       N.Y. Bar Number 5400221
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C.  20530
       Telephone: (202) 307-5967
       Email: jeffrey.kiok2@usdoj.gov

---

imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

## <u>CERTIFICATE OF SERVICE</u>

On this 20th day of April 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ Jeffrey A. Kiok_____
JEFFREY A. KIOK
Attorney (detailed)
N.Y. Bar Number 5400221
United States Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
Telephone: (202) 307-5967
Email: jeffrey.kiok2@usdoj.gov